# United States Court of Appeals

### For the Eighth Circuit

_____

## No. 11-3611

_____

BancorpSouth Bank, a Mississippi Banking Corporation

*Plaintiff - Appellee*

v.

Hazelwood Logistics Center, LLC, formerly known as Hazelwood Commerce
Center LLC; Hazelwood Commerce Redevelopment Corporation; Paul J. McKee
Jr., Individually; Paul J. McKee Jr., in his capacity as Trustee of the Paul J. McKee
Jr. Revocable Trust

*Defendants - Appellants*

_____

## No. 11-3741

_____

Murphy Property Tax

*Intervenor - Appellant*

BancorpSouth Bank, a Mississippi Banking Corporation

*Plaintiff - Appellee*

v.

Hazelwood Logistics Center, LLC, formerly known as Hazelwood Commerce Center LLC; Hazelwood Commerce Redevelopment Corporation; Paul J. McKee, Jr., Individually; Paul J. McKee, Jr., in his capacity as Trustee of the Paul J. McKee Jr. Revocable Trust

*Defendant*s

————————

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

————————

Submitted: September 19, 2012
Filed: February 14, 2013

————————

Before RILEY, Chief Judge, SMITH and COLLOTON, Circuit Judges.

————————

RILEY, Chief Judge

BancorpSouth Bank (bank), successor by merger to The Signature Bank, sued Hazelwood Logistics Center, LLC and Hazelwood Commerce Redevelopment

Corporation (collectively, HLC), and Paul J. McKee, Jr., both individually and in his capacity as Trustee of the Paul J. McKee, Jr. Revocable Trust, (McKee and, collectively with HLC, Hazelwood), alleging breach of contract against HLC, breach of guaranty against McKee, and asserting a security interest in some of HLC's property. Hazelwood raised lack of subject matter jurisdiction, improper venue and choice of forum, and a state law contract defense. Murphy Property Tax (MPT) intervened, claiming priority over real property tax refunds owed to HLC and attached by the bank. The district court[1] found jurisdiction and venue were proper and granted summary judgment to the bank on the breach of contract, breach of guaranty, and priority issues. Hazelwood and MPT appeal.

## I.    BACKGROUND
### A.    Factual Background
#### 1.    Financing

HLC was formed to implement a commercial real estate development project, known as the Hazelwood Logistics Center, in the City of Hazelwood, Missouri. To finance the development, HLC and the bank entered into a Land Acquisition Loan Agreement (acquisition agreement) on October 7, 2005, and a Development Loan Agreement (development agreement) on August 11, 2006 (collectively, as amended loan agreements). All Hazelwood parties are Missouri citizens, and the bank is a Mississippi citizen.

Under the loan agreements, the bank agreed to loan HLC up to the maximum principal amount of $36,242,700. The loan was evidenced by a promissory note in the principal amount of $35,197,500, as amended. HLC granted the bank a security interest in its assets relating to the property, including "all general intangibles" and

---

[1]The Honorable Henry E. Autrey, United States District Judge for the Eastern District of Missouri.

"all Tax . . . Deposits." McKee guaranteed HLC's obligations under the loan agreements (guaranty).

On August 11, 2006, the bank entered into a participation agreement with four other banks, whereby the bank sold the participating banks undivided interests in the loan. At the time this lawsuit was filed, the four participating banks were Heartland Bank, Centrue Bank, Excel Bank, and Sun Security Bank (participating banks). The participating banks collectively held approximately 69% of the loan, and the bank retained the balance. At least three of the participating banks were citizens of Missouri.

Under the participation agreement, the bank retained primary authority to administer the loan, subject to a few minor exceptions. The bank "h[e]ld in its name (as payee, endorsee or assignee), and ha[d] title to and retain[ed] possession or control of, the Loan Documents and all other security documents, papers and other items provided for or required under the Loan Documents." The agreement provided that, in dealing with Hazelwood and with third parties, the bank was "considered to be the sole owner and holder of the Loan," and the bank, after reasonable efforts to collect, "without the consent of the [participating banks], [could] proceed to foreclose upon the collateral securing the Loan by appropriate proceedings." The bank could not decrease the interest rate under the loan, increase the amount of the loan, or extend the maturity of the loan, without the participating banks' prior written consent.

## 2. Development

Part of the Hazelwood property (property or Hazelwood property) was a former landfill site and required environmental remediation before it could be put to commercial use. Hazelwood hired contractors to prepare and implement a remedial action plan to address the property's environmental issues. Hazelwood and the bank contend the contractors negligently caused methane gas to spread "across portions of

the [p]roperty previously uncontaminated by methane." Hazelwood's expert witness reported:

> In its present condition the . . . property cannot be developed for commercial use. The presence of landfill gas, specifically methane, in the subsurface soil at the property is impairing development at the property. Extensive additional investigation is needed before developing remedial alternatives for addressing methane concerns at the site.

On October 30, 2009, the loan matured, and Hazelwood failed to pay the amount owed.

### 3.    Tax Refunds

MPT is a commercial property tax consulting firm. On July 1, 2009, HLC and MPT entered into an agreement for MPT to review HLC's property tax liability "for the 2007/2008 and 2009/2010 assessment years." HLC agreed to pay MPT a contingency "fee of thirty five percent (35%) of the tax savings for each of the 2007 thru 2009 assessment years." MPT contends the bank was aware of HLC's contract with MPT and "underst[ood] that MPT's fee was to be paid out of any tax refunds procured." MPT successfully obtained tax refunds for HLC in the amount of $465,379, plus interest.

### B.    Procedural History

On April 7, 2010, the bank sued the various Hazelwood parties for respective breaches of contract, breaches of the guaranty, and related claims, invoking the district court's diversity jurisdiction. See 28 U.S.C. § 1332(a)(1). Hazelwood moved to dismiss the action based on the loan agreements' and guaranty's choice of venue provisions and Hazelwood's claim the district court lacked subject matter jurisdiction. The district court denied these motions.

The bank moved for a prejudgment writ of attachment on HLC's expected real property tax refunds. The district court granted the motion on August 6, 2010. The Missouri State Tax Commission disbursed tax refunds of $466,128.37 to the bank pursuant to the writ of attachment. MPT moved to intervene, asserting an interest in the tax refunds. The district court granted MPT's motion to intervene.

The bank moved for summary judgment against Hazelwood and MPT, and MPT moved for summary judgment against the bank. Hazelwood resisted the bank's motion for summary judgment, arguing the various loan contracts were not enforceable under the doctrine of commercial frustration. The district court denied MPT's motion for summary judgment, and granted the bank's motions for summary judgment against Hazelwood and MPT.

The district court's order granting summary judgment on the bank's claims against Hazelwood did not enter a damages amount. The bank moved pursuant to Federal Rule of Civil Procedure 59(e) for an amended judgment entering an amount of damages. The bank filed the motion on November 28, 2011, five days after the district court's entry of judgment and three days after Hazelwood filed its notice of appeal to this court. Hazelwood opposed the bank's motion to amend, arguing (1) the motion was procedurally improper under Federal Rule of Civil Procedure 60(a), and (2) the bank's motion for summary judgment was not supported by sufficient evidence and suffered from a procedural defect. The district court granted the bank's motion.

Hazelwood and MPT appeal. Having jurisdiction under 28 U.S.C. § 1291, we affirm.

## II. DISCUSSION

### A. Standard of Review and Choice of Law

"We review de novo a district court's grant of summary judgment, viewing all facts and making all reasonable inferences in the light most favorable to the non-moving party." Cent. Platte Natural Res. Dist. v. U.S. Dep't of Agric., 643 F.3d 1142, 1146 (8th Cir. 2011). We affirm summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Cent. Platte Natural Res. Dist., 643 F.3d at 1146.

In this diversity case, we apply the substantive law that would be applied by a Missouri state court. See Schwan's Sales Enters. v. SIG Pack, Inc., 476 F.3d 594, 595-96 (8th Cir. 2007). The loan agreements and guaranty provide Missouri law governs the interpretation and application of the contracts. Under Missouri law, "[a] valid choice of law provision in a contract binds the parties," State ex rel. McKeage v. Cordonnier, 357 S.W.3d 597, 600 (Mo. 2012) (en banc), and the parties here—including MPT, whose contract with HLC was made and performed in Missouri—do not contend any law other than Missouri law applies. The loan agreements each additionally provide the "Loan Agreement and other Loan Documents shall not be construed against [the bank] merely because of the involvement of [the bank] in the preparation of such documents and agreements."

### B. Subject Matter Jurisdiction

We first address whether the district court had subject matter jurisdiction over this case. See, e.g., Associated Ins. Mgmt. Corp. v. Ark. Gen. Agency, Inc., 149 F.3d 794, 796 (8th Cir. 1998). "'[D]iversity of citizenship is determined by reference to the parties named in the proceeding before the district court, as well as any indispensable parties who must be joined pursuant to Rule 19'" of the Federal Rules of Civil Procedure. Northport Health Servs. of Ark., LLC v. Rutherford, 605 F.3d 483, 486 (8th Cir. 2010) (quoting Doctor's Assocs., Inc., v. Disatajo, 66 F.3d 438, 445 (2d Cir. 1995); see also Little v. Giles, 118 U.S. 596, 603 (1886) (explaining "where

the interest of the [named] party is real, the fact that others are interested who are not necessary parties, and are not made parties, will not affect" diversity jurisdiction) (quoted in <u>Lincoln Prop. Co. v. Roche</u>, 546 U.S. 81, 93 (2005)). Hazelwood asserts a lack of complete diversity of citizenship because both Hazelwood and (at least some of) the participating banks are Missouri citizens. The participating banks were not named parties in the action below, and Hazelwood has not demonstrated the participating banks were necessary parties to the suit under Rule 19. We therefore reject Hazelwood's argument.[2]

Hazelwood invokes <u>Iowa Public Service Co. v. Medicine Bow Coal Co.</u>, 556 F.2d 400 (8th Cir. 1977). In <u>Iowa Public Service</u>, individual utility companies sued individual coal companies in state court. <u>See id.</u> at 401-02. Some plaintiffs were diverse from the defendant coal companies, but the others were not. <u>See id.</u> at 402. The coal companies sought to remove the case to federal court, arguing the non-diverse plaintiffs were not real parties to the controversy and had been fraudulently joined to defeat federal jurisdiction. <u>See id.</u> We disagreed, holding the dismissed non-diverse plaintiffs were real parties in interest and removal from state court was not proper. <u>See id.</u> at 406. Contrary to Hazelwood's arguments, <u>Iowa Public Service</u> does not demonstrate the participating banks—who were not made parties in the action below—are necessary parties to the suit merely because they hold an interest in the loan.

---

[2]Hazelwood asserts the district court improperly relied on Fed. R. Civ. P. 17 to determine the Bank was a real party in interest capable of bringing suit in its own capacity, arguing "[t]he Federal Rules of Civil Procedure have no bearing on the requirements of federal diversity jurisdiction." <u>Associated Ins. Mgmt. Corp.</u>, 149 F.3d at 796-97. For reasons later discussed, Hazelwood has not established the participating banks were necessary parties for diversity purposes, irrespective of Rule 17.

Hazelwood argues the bank and the participating banks function as an unincorporated business organization, and as such the citizenship of each member of the organization is relevant for diversity purposes. See Underwriters at Lloyd's, London v. Osting-Schwinn, 613 F.3d 1079, 1086, 1088 (11th Cir. 2010) (holding a British insurance syndicate is an unincorporated business organization and therefore has the citizenship of each of its members). Underwriters also is distinguishable. In Underwriters, the syndicate itself was the party bringing suit. In the instant case, the bank sued in its individual capacity and, at most, on behalf of the participating banks in a representative capacity. That the participating banks are alleged to be in a business relationship with the bank similar to an insurance syndicate is not dispositive.

We believe a better analogy is Navarro Savings Association v. Lee, 446 U.S. 458 (1980). In Navarro, the Supreme Court recognized a trustee may sue on behalf of a business trust, and only the trustee's citizenship is relevant for diversity purposes. See id. at 462 (citing Chappedelaine v. Dechenaux, 8 U.S. (4 Cranch) 306, 308 (1808)). Navarro recognized "a trustee is a real party to the controversy for purposes of diversity jurisdiction when he possesses certain customary powers to hold, manage, and dispose of assets for the benefit of others." Id. at 464. "That the trust may depart from conventional forms in other respects has no bearing upon this determination." Id. at 465.

In this case, the bank "ha[s] legal title; . . . manage[s] the assets; [and] . . . control[s] the litigation." Id. The participating banks are "'not necessary parties and their citizenship [is] immaterial.'" Id. at 464 (quoting Bullard v. Cisco, 290 U.S. 179, 190 (1933)); see also Dexia Crédit Local v. Rogan, 629 F.3d 617, 619-20 (7th Cir. 2010) (deciding a participation agreement between a diverse plaintiff and a non-diverse non-party did not divest the court of subject matter jurisdiction where the named corporate plaintiff was a real party in interest); Oscar Gruss & Son, Inc. v. Hollander, 337 F.3d 186, 193-95 (2d Cir. 2003) (determining a business entity was a real party in interest for diversity purposes where the entity held an 11.53% interest

in the subject of the lawsuit, had a genuine financial stake in the outcome of the lawsuit, and also held an express power to act on behalf of other interested persons). The district court properly exercised jurisdiction under 28 U.S.C. § 1332(a)(1).[3]

### C. Venue

Hazelwood also maintains the action in federal court violated the loan agreements' and the guaranty's choice of venue provisions. We disagree.

The loan agreements provide:

> Any legal action or proceeding with respect to this Loan Agreement or any of the other Loan Documents may be brought in the Courts of the County of St. Louis, State of Missouri, and . . . [HLC] and [the bank] consent[], for itself and in respect of its property, to the jurisdiction of those Courts. . . . **Nothing in this [s]ection . . . shall . . . limit the right of [the bank] to bring any action or proceeding against [HLC] or its property in the Courts of any other jurisdiction.**

(Emphasis added). The guaranty also contained a choice of venue provision. This provision stated, "at [the bank's] sole and absolute election, all legal and other proceedings of any kind arising out of or related to this Guaranty shall be litigated in courts having sites in the County of St. Louis, Missouri."

Under Missouri law, a forum selection clause is enforceable so long as "the clause [was] obtained through freely negotiated agreements absent fraud and

---

[3]In comparing the participation agreement to a business trust for purposes of jurisdiction, we in no way imply the agreement created a fiduciary relationship between the bank and the participants, or that other state law trust doctrines might apply. See First Citizens Fed. Sav. & Loan Ass'n v. Worthen Bank & Trust Co., 919 F.2d 510, 513 (9th Cir. 1990) (explaining the existence of a fiduciary relationship between participants in a participation agreement depends on the terms of the agreement and intent of the parties).

overreaching and its enforcement must not be unreasonable and unjust." Chase Third Century Leasing Co. v. Williams, 782 S.W.2d 408, 411 (Mo. Ct. App. 1989). The dispute in this case involves the proper interpretation of the clauses, not whether enforcement of the clauses would be unreasonable. "An unambiguous contract must be enforced according to its terms." Turner v. Sch. Dist. of Clayton, 318 S.W.3d 660, 670 (Mo. 2010) (en banc) (per curiam). "'A contract is only ambiguous, and in need of a court's interpretation, if its terms are susceptible to honest and fair differences.'" Ethridge v. TierOne Bank, 226 S.W.3d 127, 131 (Mo. 2007) (en banc) (quoting State ex rel. Vincent v. Schneider, 194 S.W.3d 853, 860 (Mo. 2006) (en banc)).

In this case, the forum selection clauses are unambiguous and will be enforced as written. The loan agreements simply provide an action *may be brought* in the courts of St. Louis County, but do not indicate such actions *must* be brought there. This clause is permissive, not mandatory. Cf. Dunne v. Libbra, 330 F.3d 1062, 1063 (8th Cir. 2003) (noting the distinction between permissive and mandatory forum selection clauses).

Hazelwood contends the forum selection provision in the guaranty is mandatory, because it provides "all legal . . . proceedings . . . shall be litigated in courts having sites in the County of St. Louis, Missouri." This provision is applicable "at [the bank's] sole and absolute election," and does not limit the bank's ability to select an alternative forum. Hazelwood asserts the provision is ambiguous, suggesting the clause "grants [the bank] discretion to choose among the courts sited in St. Louis County, Missouri." (Underlining in original). We reject this interpretation. Hazelwood has not identified any federal courts situated in St. Louis County, Missouri, nor shown there are multiple courts in St. Louis County with jurisdiction over this action in which the bank could have exercised its discretion.

Hazelwood further argues, if the clause were construed as permissive, "there was no need for the clause . . . because the Loan was made in St. Louis County and

-11-

the Property is located in St. Louis County." Hazelwood's argument fails because the clause is permissive with respect to the bank only. The bank could enforce the choice of venue provision against Hazelwood were Hazelwood to bring suit elsewhere.

We hold the forum selection clauses are permissive and did not prohibit the bank from bringing suit in the United States District Court for the Eastern District of Missouri.

### D.    Commercial Frustration

Hazelwood claims the doctrine of commercial frustration relieves Hazelwood of its obligations under the loan agreements and guaranty. We disagree.

The Supreme Court of Missouri has not expressly adopted the doctrine of commercial frustration, see Ellis Gray Mill. Co. v. Sheppard, 222 S.W.2d 742, 748 (Mo. 1949) (recognizing the doctrine had not been adopted in Missouri as of 1949), although the doctrine has been applied by one of Missouri's intermediate appellate courts, see Howard v. Nicholson, 556 S.W.2d 477, 481-82 (Mo. Ct. App. 1977). The Howard court explained, "if the happening of an event not foreseen by the parties and not caused by or under the control of either party has destroyed or nearly destroyed either the value of the performance or the object or purpose of the contract, then the parties are excused from further performance." Id.

We assume for the sake of discussion the Supreme Court of Missouri would recognize the commercial frustration doctrine as expounded by Howard. Cf. Friedberg v. Chubb & Son, Inc., 691 F.3d 948, 951 (8th Cir. 2012) ("We must predict how the Supreme Court of [Missouri] would rule, and we follow decisions of the intermediate state court when they are the best evidence of [Missouri] law."). Applying the Howard standard, Hazelwood is not entitled to relief. We suspect methane gas contamination during environmental remediation of a landfill is a foreseeable risk. See Conlon Grp., Inc. v. City of St. Louis, 980 S.W.2d 37, 40-41

(Mo. Ct. App. 1998) (concluding the loss was foreseeable and the commercial frustration doctrine did not apply when a real estate developer discovered severe structural defects in a 100-year-old building the developer had planned to refurbish). We need not address this contingency directly. Even if the methane gas contamination were an unforeseeable occurrence, the contamination did not result in "a total or practically total destruction of the purpose or object of the transaction." Howard, 556 S.W.2d at 483. In its statement of facts, Hazelwood declares "[t]he Loan was made for the stated purpose of the environmental remediation by third-parties and the commercial real estate development of the Property by" HLC. HLC already has acquired the property and can still pursue "environmental remediation" and ultimately "commercial real estate development of the Property." Hazelwood's plan may have "become less profitable," or Hazelwood may even "sustain a loss," Restatement (Second) of Contracts (Restatement) § 265 cmt. a (1981), but loss of profit is not a sufficient ground to cancel a contract under the commercial frustration doctrine, which requires the "total or practically total destruction of the purpose or object of the transaction," Howard, 556 S.W.2d at 483. See also Restatement § 265 cmt. a.

The district court did not err in granting summary judgment to the bank on its breach of contract claim against HLC, or the breach of guaranty claim against McKee.

### E.    Damages

Hazelwood insists the district court erred in amending its judgment to include a specific damage award. We disagree.

First, Hazelwood asserts the district court lacked jurisdiction to amend the judgment because the bank's motion should have been made under Federal Rule of Civil Procedure 60(a). Under Rule 60(a), the district court generally must seek leave of this court to correct an error in the judgment once an appeal of the judgment has been docketed, and no such leave was sought in this case. Federal Rule of Appellate Procedure 4(a)(4) clarifies that no leave is necessary if the Rule 60(a) motion is filed

within twenty-eight days of entry of judgment. <u>See</u> Fed. R. App. P. 4(a)(4)(A)(vi), (B)(i) (providing a notice of appeal does not take effect until the district court disposes of any Rule 59 or Rule 60 motions, provided such motions are filed within twenty-eight days of entry of judgment); <u>see also</u> <u>id.</u>, Advisory Committee Notes to paragraph (a)(4) for the 1993 Amendment ("A notice filed before the filing of [a Rule 59 or Rule 60] motion[] . . . is, in effect, suspended until the motion is disposed of."). The bank's motion was filed five days after entry of judgment; therefore, the district court had authority to amend its judgment without leave of this court, regardless of whether the motion was made under Rule 59 or Rule 60.

Second, Hazelwood proposes the bank failed to comply with the Eastern District of Missouri's Local Rule 7-4.01(E), requiring a summary judgment movant to set forth each material fact in separately numbered paragraphs. The bank did not list the damages calculation in its statement of material facts. Instead, the bank stated "all principal and interest outstanding became due and owing," and cited to an affidavit from a bank representative with knowledge of the basis for the damages claim. The affidavit calculated the total amount due and was attached to and cited in the bank's motion for summary judgment. The bank also included the damages calculation in the bank's prayer for judgment, although the prayer did not explicitly cite the affidavit in support of the amount of damages claimed.

Even if the bank procedurally erred in drafting its motion for summary judgment and supporting materials, Hazelwood suffered no prejudice. <u>See</u> 28 U.S.C. § 2111 ("On the hearing of any appeal . . . , the court shall give judgment after an examination of the record without regard to errors or defects which do not affect the substantial rights of the parties."); Fed. R. Civ. P. 61; <u>Taylor v. Dickel</u>, 293 F.3d 427, 430 (8th Cir. 2002) ("'To constitute reversible error, it must be established that the error complained of affected the substantial rights of the objecting party'" (quoting <u>Gilliam v. City of Omaha</u>, 524 F.2d 1013, 1015 (8th Cir. 1975))). Hazelwood actually

-14-

was aware of the amount of damages claimed and the factual basis for the calculation. Hazelwood is entitled to no relief on this proposition.

Third, Hazelwood contends the bank's calculation is not supported by sufficient evidence, and speculates the total includes sums not properly chargeable to Hazelwood. Hazelwood first raised these contentions in opposition to the bank's Rule 59(e) motion to amend the judgment, and Hazelwood has not provided any evidence to support its factual contentions. The bank offered an affidavit listing the total damages assessment and explaining the basis for the calculation. This factually uncontroverted evidence is sufficient to support summary judgment. Hazelwood submitted no evidence to challenge the calculation, so there is no genuine dispute of fact on this matter. Hazelwood failed factually to contest the bank's damages assessment before the district court, and is not entitled to relief on appeal. Cf. Winthrop Res. Corp. v. Eaton Hydraulics, Inc., 361 F.3d 465, 471 n.11 (8th Cir. 2004) (affirming summary judgment on damages where the opposing party failed to challenge the factual basis for the damages calculation at the summary judgment stage).

### F.    Tax Refunds

MPT challenges the district court's ruling granting summary judgment to the bank on MPT's claim against HLC's real property tax refunds. We agree with the district court's ruling.

In connection with the loan agreements, the bank acquired a security interest in some of HLC's assets, including "all Tax . . . Deposits," "all general intangibles" and "all other property, rights, interests, estates, or claims of any name, kind, character or nature or properties now owned or hereafter acquired in the other properties and interests comprising the Premises." Noting the bank filed a UCC-1 financing

-15-

statement, the district court concluded the bank had a valid, perfected security interest in the tax refunds.[4]

The district court determined MPT's contingency fee agreement with HLC created an equitable lien for MPT on any tax refunds received by HLC. We assume, without deciding, MPT has an equitable lien on the tax refunds. We then must determine whether MPT's lien in the refunds has priority over the bank's perfected security interest.

MPT asserts the bank's security interest does not encompass the tax refunds, arguing the agreement's reference to "all Tax . . . Deposits" does not include tax refunds. Whatever the meaning of "all Tax . . . Deposits," the bank's security interest in "general intangibles" relating to the Hazelwood property does encompass tax refunds. See In re Don Connolly Const. Co., 110 B.R. 976, 978 (Bankr. M.D. Fla. 1990) ("'It is now well established that the right to receive a tax refund and the anticipated tax returns [sic] themselves are general intangibles.'" (quoting Lazere Fin. Corp. v. Palmetto Pump & Irrigation, Inc., 81 B.R. 109, 111 (Bankr. M.D. Fla. 1987))); see also In re Metric Metals Int'l, Inc., 20 B.R. 633, 636 (Bankr. S.D.N.Y. 1981) ("Although there is little authority with respect to whether a tax refund is a general intangible, the cases and commentators that have addressed the question agree that tax refunds constitute general intangibles as defined in the [Uniform Commercial] Code" (Code)). We are not aware of any jurisdiction that has concluded a tax refund is not a general intangible under the Code, and we anticipate the Supreme Court of Missouri would reach the same conclusion. Cf. Friedberg, 691 F.3d at 951.

MPT argues its equitable lien in the tax refunds has priority over the bank's security interest because permitting the bank to profit from MPT's labor in obtaining

_____

[4]Because MPT does not challenge the district court's express finding, we accept the district court's finding that the bank validly perfected its security interest in HLC's property, although the record is unclear.

-16-

the tax refunds would be "unjust and inequitable."  MPT's arguments are inconsistent with Article 9 of Missouri's Uniform Commercial Code—Secured Transactions, Mo. Rev. Stat. § 400.9-101, et seq. (U.C.C.), which establishes a comprehensive system of priorities for competing claims of this nature.  Mo. Rev. Stat. § 400.9-301.  Cf. Lone Oak Farm Corp. v. Riverside Fertilizer Co., 428 N.W.2d 175, 180 (Neb. 1988) (explaining under Nebraska's Code Art. 9, an equitable lien is an unperfected security interest and subordinate to a perfected security interest).

Regardless of whether MPT's equitable lien is an unperfected security interest, see Mo. Rev. Stat. § 400.9-102(71); see also Lone Oak Farm Corp., 428 N.W.2d at 180, or a lien, see Mo. Rev. Stat. § 400.9-102(52), the bank's perfected security interest takes priority.  The U.C.C. "determine[s] the law governing . . . the priority of a security interest in collateral."  Id. § 400.9-301.  "A perfected security interest . . . has priority over a conflicting unperfected security interest," id. § 400.9-322(a)(2), or an after-acquired lien, see id. § 400.9-317(a), except as otherwise provided by law, see id. § 400.9-322(a); cf. Gale & Co. v. Hooper, 323 S.W.2d 824, 826-27 (Mo. Ct. App. 1959).

MPT suggests its equitable lien is equivalent to a common law artisan's lien,[5] which under Missouri law has priority over "all other secured interests," citing Gale & Co., 323 S.W.2d at 826-27.  Gale & Co. decided a mechanic who serviced an automobile acquired a common law first priority lien in the vehicle for the value of

---

[5]It is not clear whether Missouri recognizes such a lien.  Compare Gale & Co. v. Hooper, 330 S.W.2d 826, 827 (Mo. 1959) (per curiam) (affirming the Missouri Court of Appeals' judgment "that the chattel mortgage on an automobile was subordinate to the common law artisan's lien" in favor of an automobile mechanic), with Fleming-Gilchrist Const. Co. v. McGonigle, 89 S.W.2d 15, 18 (Mo. 1935) ("Mechanics' liens were neither recognized at common law nor allowed in equity" and must be determined "almost exclusively [by] the construction of statutes.").  We need not determine how the Supreme Court of Missouri would resolve this apparent conflict.

services rendered.  See id. at 826-27, 830.  The Supreme Court of Missouri, with little explanation, transferred the case and affirmed Gale & Co. "in the agreed but precisely limited circumstances."  Gale & Co., 330 S.W.2d at 827.  The common law artisan's lien recognized in Gale & Co. applies where the artisan "has enhanced the value of [a] chattel" "while . . . in [the artisan's] possession," Gale & Co., 323 S.W.2d at 826, and exclusively is "dependent upon possession," Ozark Fin. Serv., a Div. of Ozark Kenworth, Inc. v. Turner, 735 S.W.2d 374, 375 (Mo. Ct. App. 1987).  MPT's professional services obviously did not enhance the value of any chattel in MPT's possession.

MPT proposes our 1927 decision in Geddes v. Reeves Coal & Dock Co., 20 F.2d 48 (8th Cir. 1927), indicates we can disregard Missouri's statutory priority scheme in the interest of fairness and equity.  In MPT's words, "this Court [in Geddes] did not focus on any one particular state's law . . . in applying the well recognized doctrine of equitable liens."  The Geddes case was decided before the adoption of the Code and more than ten years before Erie Railroad Co. v. Tompkins, 304 U.S. 64, 78 (1938), established, "[e]xcept in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the state."  We are not free to disregard Missouri's express statutory law, and instead follow our general perceptions of equity.[6]

MPT repeatedly emphasizes its assertion the bank was aware of and acquiesced to MPT's expectation it could collect its fees from the tax refunds.  Besides arguing

---

[6]MPT cites two bankruptcy cases applying the laws of other states.  In re Reda, Inc., 54 B.R. 871, 880-82 (Bankr. N.D. Ill. 1985), turns on the application of federal bankruptcy law, 11 U.S.C. § 506(c), and is inapplicable to MPT's claim.  The second case, In re Alston, 322 B.R. 265, 270-71 (Bankr. D.N.J. 2005), considered the public policy underlying the state's statutory super priority provisions to craft a non-statutory, equitable super priority right in the equitable lienholder.  This result is contrary to U.C.C. §§ 400.9-301, 400.9-317, and 400.9-322, and we decline to follow it.  See Lone Oak Farm, 428 N.W.2d at 180.

injustice and public policy, MPT has not explained how the bank's purported knowledge of MPT's agreement with HLC is relevant to the issue of statutory priority. We need not decide whether these purported facts would affect our analysis in this case, because MPT has not offered sufficient evidence for us to conclude, for purposes of summary judgment, the bank knew of and acquiesced in MPT's claim for the refunds. See Fin. Timing Publ'ns, Inc., v. Compugraphic Corp., 893 F.2d 936, 942 (8th Cir. 1990) (reiterating, "[a] party may not rely solely on inadmissible hearsay in opposing a motion for summary judgment").

In support of its position, MPT presented an e-mail exchange between the bank and Hazelwood in January 2010. In the e-mail, the bank's vice president recognized MPT had performed services for HLC and asserted MPT should not be paid out of the refunds. In its response, HLC claimed MPT, Hazelwood, and the bank shared a "general understanding" at the time the agreement was made that MPT would be paid from the refund proceeds. Hazelwood's e-mailed statement regarding the bank's "general understanding" is speculation and hearsay, and MPT did not argue the statements were admissible under any relevant exception to the hearsay rule. See, e.g., Fed. R. Evid. 801(c) (defining hearsay as an out of court statement offered "to prove the truth of the matter asserted"). The bank vice president's statements may not be hearsay. See Fed. R. Evid. 801(d)(2) (explaining an out of court statement made by a party and offered into evidence against that party is not hearsay). Even construed favorably for MPT, the bank vice president's statements do not show the bank was aware of MPT's contract with HLC *before* MPT performed its services, so the statements do not prove the bank acted unfairly toward MPT.

MPT is understandably upset that its labor produced the tax refunds at issue, and the bank arguably is receiving a windfall—but for MPT's efforts, there would be no tax refunds for the bank to recover. MPT suggests the result in this case is poor public policy, as it will create a disincentive for similarly situated professionals to provide these services in the future. However, MPT had notice of the bank's security

-19-

interest and could have protected itself by having the bank agree in advance to subordinate the bank's security interest, in whole or in a compromised part, in exchange for MPT's services. We decline MPT's invitation to disregard state law and craft an "equitable" solution designed to protect a party who fails to take reasonable steps to protect itself and assumes a known risk.

## III. CONCLUSION

We affirm the district court's entry of summary judgment in favor of the bank.

_____